FERGUSON, Judge
(dissenting).
Eugene Jackson died from a heart attack after being discharged from a hospital, without admittance or treatment, where he presented classic symptoms of a serious cardiovascular ailment. This action commenced as a medical malpractice action against a cardiologist and an emergency room physician. At issue is whether the jury verdict absolving both defendants of liability accords with the evidence as a matter of law where it is undisputed that there was a departure from acceptable standards of medical care. In my view the jury verdict, and the majority affirmance of the judgment, are puzzling.
On Thursday, June 11, 1987, just three months after his marriage to Susan, thirty-eight year old Eugene suffered pains in his arms and chest while at work as an aircraft technician. Heeding a co-worker’s insistence that he see a doctor, Jackson called his mother-in-law who is a registered nurse at James Archer Smith Hospital and explained his physical pains. She referred him to Dr. Sokolowicz, a cardiologist, who instructed him to go to the nearest hospital immediately, see the physician, and have the hospital physician call him back.
Jackson reported to the emergency room at James Archer Smith Hospital at 6:11 p.m. and gave a description of his symptoms. A call was made to Dr. Sokolowicz at 6:35 p.m. to inform him that the patient had arrived. According to a medical chart, prepared at that time, Jackson’s chief complaints were epigastric burning pain, chest pain, tingling of the arms, sweating and shortness of breath. EKG and blood tests were performed. Dr. Icaza, who came on duty at 7:00 p.m., reviewed the charts, examined the patient, related the symptoms to Gene’s gastrointestinal tract, and diagnosed him as having “heartburn”. He gave a prescription for Maalox and discharged Jackson from the hospital at 8:15 p.m.
Within 72 hours following discharge, the symptoms reoccurred while Jackson was at a gas station. His wife, Susan, drove home because he was too sick to drive. Susan called 911 after he stopped breathing. Friends, who were also called by his wife, administered CPR in a futile attempt to revive him. Eugene was airlifted to Jackson Memorial Hospital where he was pronounced dead of cardiac arrest. At the time of death, three vessels supplying circulation to his heart were narrowed 90%, 90% and 75% respectively.
Dr. Sokolowicz, a defendant in the case, was the only cardiologist to testify as to the appropriate standard of care where a patient presents symptoms as recorded in Jackson’s medical charts:
Q. Doctor, when someone presents to an emergency room with the symptoms that we have in the case, don’t you agree sir, that the person should be admitted until you can exclude or eliminate that that chest pain and those symptoms are because of cardiac disease?
A. Yes.
Q. And, as a matter of fact, you don’t expect the physician in the emergency room to conduct tests to determine the cause of the chest pain necessarily, do you? By that, I mean the catheterization or any of the sophisticated tests *475 that perhaps would be one later by a cardiologist.
A. No. I think it’s the emergency room physician’s job to decide whether or not the patient is sick, whether they need to be hospitalized or whether they are ill or they can go home, sort of a screening procedure, but not necessarily to make a specific diagnosis.
Q. Doctor, assume for me, if you will, that Gene Jackson appeared at the emergency room at the time indicated on the chart with the complaints indicated in the chart. Do you have an opinion whether it would be below medical standards to discharge Gene Jackson with those complaints?
(Objections omitted)
A. Given the information available in the chart, I think he should have been admitted.
Q. Doctor, you agree it would be below the standard not to admit him; it would deviate from acceptable medical standards in this community not to admit someone with these complaints if you have not ruled out cardiac problems being the cause of those complaints?
(Objections omitted)
A. Yes.
Q. [I]f you got the call and if you were told what’s on that chart and you did not admit Gene Jackson, you would be \ wrong, wouldn’t you?

A.\Yes.

Dr. Sokolowicz’s testimony was unrefuted.
AroundHhat established fact — of a standards deviation — the two physicians built their finger-pointing defenses. According to Dr. Icaza, he is not liable because “[a]f-ter completing ... the exams and reviewing all of the normal test results, [he] called Dr. Sokolowicz about the complaints that were noted on Jackson’s chart ... [and] Dr. Sokolowicz told him to discharge the patient.” According to Dr. Sokolowicz, he is not liable because “he either did not get the call, or the information related to him was not what was on the chart ... [because] if he had been given the information which was on the chart, he would have admitted Jackson.”
Apparently the jury believed that Dr. Icaza’s medical service did not deviate from an acceptable standard based on the testimony of his expert, Dr. Dresnick, regarding emergency room treatment:
Q. Now you have reviewed this case and totality on' behalf of Dr. Icaza. Given all of the circumstances that you find in the chart, the history that the man gave, his symptoms had subsided by the time Dr. Icaza saw him, the normal findings and test results and history you find in this form, Doctor, do you have an opinion whether Dr. Icaza’s care and treatment in terms of evaluating this patient and allowing him to be discharged to the care of a cardiologist was within the standard of care?
A. Yes. All of the right tests were ordered, and the appropriate disposition or decision as to what to do with the patient and on the basis of all of these tests, he was referred appropriately to the cardiologist. A discussion was held with the cardiologist and was within the standard of care (for emergency room physicians) to at that point send this patient home.
Dr. Dresnick’s conclusion assumes, as its basis, that Dr. Icaza conveyed to Dr. Soko-lowicz the contents of the medical chart and that Dr. Sokolowicz communicated to Dr. Icaza that the patient could be discharged — precisely the issue the jury had to resolve in finding which of the defendants was guilty of medical malpractice. But if Dr. Icaza is not liable, for the reason that the jury believed his testimony, then Dr. Sokolowicz must be liable.
Proximate causation was not made an issue by either the proof or the oral arguments. If the patient had been admitted, according to the expert testimony, stress tests and a catheterization would have been performed to discover the arterial blockages. Indeed, counsel for Dr. Sokolowicz conceded in closing argument that the issue in this case was a “very simple” one— *476 that “the call took place or it didn’t”. The single disputed factual issue for the jury to resolve on this point was whether a phone call was made to Dr. Sokolowicz, by Dr. Icaza, which conveyed the information recorded in Jackson’s medical charts. For that reason a directed verdict of liability should have been granted, leaving the jury to decide only which of the defendants to believe.
In Greenstein v. Seaboard Coast Line R.R. Co., 471 So.2d 1318 (Fla. 3d DCA 1985), this court was “puzzled” by a similar jury verdict which found the defendant not liable where a negligent act of either one of two of its employees necessarily triggered the event which caused the plaintiff’s injuries. We reversed for a new trial holding that the jury verdict was against the manifest weight of the evidence.
It is no basis for a defense verdict that the jury cannot determine which of two defendants is liable where the evidence shows that the plaintiff suffered an injury which was caused by a negligent act of at least one of them. A verdict of no negligence on such facts must be reversed as against the weight of the evidence. Greenstein. See also Scarfone v. Magaldi, 522 So.2d 902 (Fla. 3d DCA) (new trial ordered where no-fault verdict was contrary to the manifest weight of medical evidence), rev. denied, 531 So.2d 1353 (Fla.1988); Williams v. Bankers Multiple Line Ins. Co., 567 So.2d 559 (Fla. 4th DCA 1990) (new trial ordered where jury findings of comparative negligence were contrary to the weight of the evidence); Ingber v. O’Connor, 578 So.2d 9 (Fla. 4th DCA 1991) (jury finding of no permanent injury after medical testimony established permanent injuries within a reasonable degree of medical probability, reversed and remanded for a new trial on damages).
I would reverse and remand for a new trial accordingly.[1]

. As a second point on appeal the wife of the decedent contends that the jury verdict was influenced by the defense's appeal, in closing argument, to passion and prejudice. In one of the challenged arguments counsel told the jury:
[T]o me you have to evaluate Ms. Jackson’s loss, and you have to base it on her pain and suffering and how she is going on with her life. And I have thought about this a great deal. She has remarried. She’s pregnant, she’s going on with her life, and to me, ladies and gentlemen, $100,000 — if you find that there are damages in this case would be the appropriate measure of damages. Because if you come back with $10 billion, not one iota of pain is going to go away. She isn’t going to feel any better or worse for it....
A similar argument was held reversible error in Cardona v. Gutierrez, 562 So.2d 766 (Fla. 4th DCA 1990), rev. denied, 576 So.2d 287 (Fla. 1991). There the court held that defense coun- - sel’s argument concerning benefits and support that the decedent’s child would derive from living with her aunt and uncle were inflammatory and prejudicial to the child’s claim for loss of services and support of her mother. The argument was held analogous to the erroneous proposition that a surviving spouse’s remarriage is a damage mitigating fact, citing Smyer v. Gaines, 332 So.2d 655 (Fla. 1st DCA 1976). Nevertheless, reversal of the judgment is mandated without reaching the second point.